Tom Myers, SBN 176008
    Tom.myers@aidshealth.org
Samantha R. Azulay (SBN 283424)
    samantha.azulay@aidshealth.org
Christina Yang (SBN 266363)
    christina.yang@aidshealth.org
AIDS HEALTHCARE FOUNDATION
6255 West Sunset Boulevard, 21st Floor
Los Angeles, CA 90028
Telephone: (323) 860-5200
Facsimile (323) 467-8450

Andrew F. Kim (SBN 156533)
    Andrew.kim.esq@gmail.com
LAW OFFICE OF ANDREW F. KIM
9018 Balboa Boulevard, Suite 552
Northridge, CA 91325
Telephone: (818) 216-5528
Facsimile: (818) 993-3012

*Attorneys for Plaintiffs*

THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION; MICHAEL WEINSTEIN, <br><br> Plaintiffs, <br><br> v. <br><br> LOS ANGELES COUNTY, *et al.*, <br><br> Defendants. | ) No.: 2:12-cv-10400-PA-SHx <br> ) <br> ) **REQUEST FOR JUDICIAL** <br> ) **NOTICE IN SUPPORT OF** <br> ) **PLAINTIFFS' OPPOSITION TO** <br> ) **DEFENDANTS' MOTION FOR** <br> ) **SUMMARY JUDGMENT, OR, IN** <br> ) **THE ALTERNATIVE, PARTIAL** <br> ) **SUMMARY JUDGMENT** <br> ) <br> ) **[Filed Concurrently with]** <br> ) <br> Date:    February 10, 2014 <br> Time:    1:30 p.m. <br> Crtrm.: 15 <br><br> Judge: Hon. Percy Anderson <br> Magistrate Judge: Hon. Stephen J. Hillman |

Plaintiffs AIDS Healthcare Foundation and Michael Weinstein ("Plaintiffs") respectfully request that this Court take judicial notice of the items listed below.

Judicial notice is appropriate where the fact is not subject to reasonable dispute because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice by a court is mandatory "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). Therefore, Intervenors request that the Court take judicial notice of the following items:

1. A news article from the Los Angeles Times, by Seema Mehta and Abby Sewell, titled "Michael Weinstein, leader in AIDS movement has hard-charging style", dated Jan. 4, 2014, *available at* http://www.latimes.com/local/la-me-weinstein-aids-20140105,0,1542856.story.  A true and correct copy of this document is attached hereto as Exhibit A.

2. An article from the website of Los Angeles County Supervisor Zev Yaroslavsky, titled "Will new condom law make porn safer?", dated July 10, 2012, *available at*  http://zev.lacounty.gov/news/will-new-condom-law-make-porn-safer (also produced by Defendants in this litigation, bearing bates numbers LACF019162-64).  A true and correct copy of this document is attached hereto as Exhibit B.

3. Relevant excerpts from the transcript of the July 10, 2012 Board of Supervisors meeting.  A true and correct copy of these excerpts is attached hereto as Exhibit C.

4. Relevant excerpts from the transcript of the July 24, 2012 Board of Supervisors meeting.  A true and correct copy of these excerpts is attached hereto as Exhibit D.

Requests to take judicial notice of government documents and records generally are granted.  *See, e.g.*, *Lopez v. Wachovia Mortg.*, 2010 U.S. Dist. LEXIS

72439, at *5-6 (N.D. Cal. July 19, 2010) (taking judicial notice of documents that were public records and government documents, because they were not subject to reasonable dispute); *Carroll v. Yates*, 2013 U.S. Dist. LEXIS 2321, at *19-20 (E.D. Cal. Jan. 4, 2013) (granting judicial notice of government document, as it was issued by a government agency and the document was a public record); *Gens v. Wachovia Mortg. Corp.*, 2010 U.S. Dist. LEXIS 54932, at *6-7 (N.D. Cal. May 12, 2010) (taking judicial notice of letter issued by government agency, as it complied with the requirements of Rule 201(b)(2) of the Federal Rules of Evidence).

The Court may also take judicial notice of news articles. *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-459 (9th Cir. 1995) (proper to take judicial notice of newspaper article that reflecting fact "generally known in Southern California and which would be capable of sufficiently accurate and ready determination"); *see also Patel v. Parnes,* 253 FRD 531, 549 (C.D. Cal. 2008) (trial court took judicial notice of news articles regarding corporate officers' stock in corporation and corporate activities).

Further, Courts in the Ninth Circuit routinely grant judicial notice of press releases. *See, e.g., In re Netflix, Inc. Securities Litig.,* 2005 U.S. Dist. LEXIS 30992, *5-6 (N.D. Cal. Nov. 18, 2005); *In re Ligand Pharmaceuticals, Inc. Securities Litig.,* 2005 U.S. Dist. LEXIS 44911, 2005 WL 2461151, *2 n. 1 (S.D. Cal. Sept. 27, 2005); *In re Homestore.com. Inc. Sec. Litig.,* 347 F. Supp. 2d 814, 816-17 (C.D. Cal. 2004).

//
//
//
//
//
//
//

1    For the foregoing reasons, Plaintiffs respectfully request that this Court take
2    judicial notice of Exhibits A through D, as attached hereto.

3

4                                            Respectfully Submitted,

5

6    DATED:  January 20, 2014          PLAINTIFFS AIDS HEALTHCARE
7                                      FOUNDATION AND MICHAEL
                                       WEINSTEIN
8

9

10                                     By:/s/ Samantha R. Azulay
                                           TOM MYERS
11                                         SAMANTHA R. AZULAY
                                           CHRISTINA YANG
12                                         *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

latimes.com/local/la-me-weinstein-aids-20140105,0,1542856.story

# latimes.com

## Michael Weinstein, leader in AIDS movement, has hard-charging style

**Among L.A. County leaders, the activist's eye-catching, uncompromising advocacy draws admiration and criticism.**

By Seema Mehta and Abby Sewell

*This article has been corrected. See note at the bottom for details.*

2:00 PM PST, January 4, 2014

Los Angeles County leaders once thought the world of Michael Weinstein, president of the AIDS <sub>advertisement</sub> Healthcare Foundation.

In a gilt-edged 1992 proclamation that still hangs behind Weinstein's desk, officials declared him "a dynamic and inspirational leader" and "an unrelenting and tireless force in the struggle to stem the tide of HIV infection."

In the years since, however, that relationship has come to resemble a dysfunctional marriage, tied together by finances and need, but strained by lawsuits, acrimony and accusations of improper spending. County leaders, now engaged in a furious legal and ballot-box battle with Weinstein, accuse him of spending his nonprofit's funds on a "personal vendetta" against the county rather than on critical services for people living with HIV and AIDS.

"He's out of control," county Supervisor Zev Yaroslavsky said recently.

Just last week, as Los Angeles counted down to the New Year, Weinstein and the organization he leads once again grabbed headlines. Gay marriage opponents called for a boycott of Pasadena's iconic Tournament of Roses Parade because the foundation planned to have a gay couple wed on its float in front of millions of viewers. Critics decried the display, alternately, as inappropriate or having nothing to do with the group's mission to stamp out HIV and AIDS, Weinstein countered that encouraging committed relationships in the gay community helps stem the virus' spread.

The moment — controversial, ostentatious and eye-grabbing — was a distillation of Weinstein. His bruising style of advocacy was forged in the early days of the AIDS epidemic, when the then-young activist grew frustrated that elected leaders were paying scant attention to the thousands of people dying from the disease. Today, 30 years later, the trim, suit-clad 61-year-old travels the globe as leader of the largest private provider of AIDS services in the U.S. and, by some measures, the world.

He oversees a $750-million budget from the 21st floor of a Sunset Boulevard skyscraper, in a corner office with a panoramic view of the Hollywood sign. While the political response to AIDS has dramatically changed since that earlier era, and many other AIDS activists have toned down their rhetoric, Weinstein's tactics remain hard-charging, persistent and, at times, polarizing.

**2**

Before the Rose Parade controversy, his group bankrolled a successful 2012 county ballot measure to require condom use in the adult film industry. And more recently it has moved to break the city of Los Angeles away from the county health agency's jurisdiction, contending city residents don't get a fair share of services. County and city officials have sued to block that ballot measure.

Supporters call Weinstein a "genius;" detractors label him a "dictator." All agree that the hawkish-featured advocate remains uncompromising.

"To get anything done in government, you have to be single-minded, dedicated almost to the exclusion of everything else. Can you do that without rubbing anyone the wrong way? I suppose it's theoretically possible," said former Gov. Gray Davis, who met Weinstein while living in West Hollywood and worked with him on AIDS-related issues. "Whether you like him or not — and I like him — he's really been a positive force for change."

Weinstein's foundation holds $30 million in county contracts to provide HIV and AIDS services. But the county has repeatedly accused the group of overbilling — which he denies — and he has accused the county of improperly awarding contracts to other organizations and using the audits to retaliate for his complaints about how health services are delivered.

"We're a black sheep, but we are part of the county family," Weinstein said. "I don't know of any other entities like us, a nonprofit that takes them on the way we do and that has the clout to get away with it."

Since his teenage days in Brooklyn, Weinstein has been a rabble-rouser. At 13, he volunteered for anti-Vietnam War congressional candidate Mel Dubin in 1966. He was active in the civil-rights and fair-housing movements. He traveled to the tumultuous 1968 Democratic National Convention in Chicago.

Four years later, the long-haired high-school dropout moved to California, came out as gay and met Chris Brownlie, who would become a close friend and partner in activism.

Weinstein settled in Los Angeles for good in the early 1980s. He planned to pursue an architecture degree, but instead went into business making chocolate gold medals to coincide with the 1984 Olympics.

By then, AIDS was becoming a scourge among gay men. Elected officials were paying little attention; President Reagan did not publicly mention the disease's name until 1985.

Weinstein recalled Brownlie dragging him to a community meeting that seemed like a Saturday Night Live skit: "I said 'I cannot do this. It's like too politically correct to be endured and nothing got done.'"

But as friends and neighbors began dying — at the time a person's life expectancy after an AIDS diagnosis was measured in months, not years — he decided he had to engage.

"My activism at that point was really a way of channeling my grief, because people were dropping like flies," he said.

Weinstein and Brownlie launched a campaign to defeat a 1986 ballot measure that would have allowed the quarantining of people with AIDS. Then their attention turned to providing the dying with a dignified death, and the AIDS Hospice Foundation was born. They led marches on the homes of officials, including county Supervisor Michael D. Antonovich — who once suggested the solution to AIDS was for gay people to turn straight.

Brownlie was diagnosed with the virus in 1987. The following year — with $400,000 from the county — the foundation opened a 25-bed facility named after him in Elysian Park. Brownlie died less than a year later, with Weinstein at his bedside.

3

"It was one of those moments in life that changes you forever," said Mary Adair, another close friend who was there.

With the advent of drugs that slowed the progression of AIDS, the foundation expanded to treatment. Its first medical clinic opened in 1990 — today there are more than 200 worldwide — and the AIDS Hospice Foundation became the AIDS Healthcare Foundation.

The foundation currently provides services to 251,000 people in 14 states and 31 countries and operates a chain of 22 Out of the Closet thrift stores in California, Florida and Ohio. The majority of its revenue, however, comes from 34 pharmacies in 10 states that are staffed by pharmacists trained to work with people suffering from HIV and AIDS.

Throughout the expansion, conflicts with friends and foes were frequent. When the foundation opened the hospices, some in the gay community accused it of consigning AIDS patients to death. The foundation in 1990 picked a fight with AIDS Project Los Angeles — then the most successful AIDS-related nonprofit, favored by the likes of Elizabeth Taylor — over its annual AIDS Walk fundraiser, arguing that it soaked up contributions that might otherwise go to smaller organizations.

In 2000, when the foundation pushed a ballot measure in West Hollywood requiring bars to provide free condoms, posters appeared calling Weinstein, who is Jewish, a "Condom Nazi" and "an enemy of the gay community."

West Hollywood City Councilman Jeffrey Prang, who opposed the measure, noted that the city already had a voluntary free-condom program. But that failed to meet Weinstein's standard, resulting in a costly but unsuccessful campaign that "alienated people," Prang said.

Weinstein now cites it as a battle he should have approached differently, because his group's effort ended up "shedding more heat than light."

"It was sort of a righteous thing, but the politics of it became more the issue than the policy," he said.

In recent years, Weinstein's group has disagreed with many in the AIDS community over Truvada, a drug that studies have shown could substantially reduce the risk of infection. Despite winning FDA approval in 2012, he argued, the drug had not been proven effective for prevention and could discourage condom use.

Dázon Dixon Diallo, chief executive of SisterLove Inc. in Atlanta, was incensed when Weinstein's group sent out a press release opposing the treatment for women, without consulting women's organizations focused on that exact issue.

"They are bullies," she said. "And they have plenty of money to bully others with."

The question of how Weinstein spends money is a constant among his critics, who say the organization spends too much on lawsuits, political activities and publicity maneuvers like the float at the Rose Parade. They say the funds would be better spent on direct services to patients. Foundation medical staff members launched a bid to unionize last year, concerned that care was taking a back seat to advocacy and public relations.

Weinstein, who expected to earn roughly $390,000 in 2013, says that both have been fundamental to the foundation since its inception, pointing to the mission statement printed on its business cards: "Cutting-edge medicine and advocacy, regardless of ability to pay."

The $2-million campaign to make adult film actors wear condoms may be the issue that has most flustered local officials. They are still embroiled in a struggle over how to enforce it, and question the wisdom of spending so much money on an industry that has seen relatively few transmissions, instead of in communities

**4**

where AIDS is growing most quickly, notably among gay and bisexual men of color.

Porn mogul Larry Flynt, who also opposed the condom mandate, said Weinstein had "played the press beautifully" on the issue.

"If the whole industry had to respond to his demands, the whole industry would just shut down. But that's not going to happen," Flynt said. "He'll get his 60 minutes of fame, I guess."

Weinstein maintains that protecting porn workers is the right thing to do. But he also concedes that the campaign is a public-relations windfall: "We got more publicity for safer sex and condoms than we ever could have gotten any other way."

The organization also does extensive work in minority communities, he added, pointing to efforts from Baton Rouge, La., and Augusta, Ga., to Jamaica and Uganda.

Weinstein, who recently married his partner of 17 years, said he tries not to take the attacks personally.

"There's a fine line between confidence and arrogance," he said. "What's happened over the decades is my confidence and the confidence of AHF has grown because we've been right."

Friend and foe alike agree that Weinstein's tactics are effective.

West Hollywood Councilman John Duran, who worked as an attorney for the Los Angeles chapter of the confrontational AIDS group ACT UP in the 1980s, recalled getting into screaming matches with Weinstein in the halls of the state Capitol over hospice regulations.

"Over the years, we've grown to respect one another, even when we don't agree. His heart is always in the right place," Duran said. "And on any political battle, I would rather be on the side of Michael Weinstein than the other side, because he's relentless."

**[For the record, Jan. 4, 2014, 3:12 p.m.:** An earlier version of the caption that accompanies this article spelled Michael Weinstein's last name as Feinstein.**]**

*seema.mehta@latimes.com*

*abby.sewell@latimes.com*

Copyright © 2014, Los Angeles Times

# Exhibit B

# Will new condom law make porn safer?

July 10, 2012



Few health issues are as obvious—or as guaranteed to generate headlines—as unsafe sex in L.A.'s booming adult film industry. But as an initiative requiring the use of condoms during porn shoots moves closer to the November ballot, it has become equally clear that, if it passes, the county would face a daunting challenge.

"This will be very difficult to enforce," said the director of the county Department of Public Health, Dr. Jonathan E. Fielding. "If it passes, we're going to do the best we can, and get the best ideas from everywhere, but there are some serious issues involved in this."

Members of the Board of Supervisors on Tuesday delayed certifying the initiative for the November ballot until July 24. They asked for a report on the impact on the county, which would be required to enforce the law if enacted.

Backed by Los Angeles AIDS activists, the measure aims to address a chronic health hazard in the nation's porn capital, where adult entertainment actors fear losing their audiences or jobs if they refuse to perform without condoms. At least three highly publicized industry HIV outbreaks have occurred since the late 1990s.

But the initiative also resurrects quandaries that have long vexed health advocates: How do you regulate a workplace that largely operates under the radar? And how much of the county's limited health resources should go to a niche that generates only about 1.5% of all its sexually transmitted diseases?

"The nature of the industry is elusive," said Mario Perez, director of the public health department's Division of HIV and STD Programs. "Film shoots happen in folks' living rooms and backyards. They're scattered throughout the county, without fixed addresses."

A 2009 report to the Board of Supervisors estimated that Los Angeles County had some 200 porn production companies, with about 1,200 workers engaging in direct, work-related sexual contact, mostly on unpermitted shoots that lasted only a few hours. And, health officials point out, unlike, say, a restaurant, where a kitchen either is sanitary or it isn't, every act is a fresh opportunity for infection.

"In the most robust sense," Perez said, "this initiative could mean that we would have to observe every sex scene in every adult film produced in Los Angeles County."

During Tuesday's meeting, Supervisor Zev Yaroslavsky echoed those concerns, saying that an unenforceable law would be "a mockery from the starter's gate."

"We need to figure out a way to make this stick," he said, "and not just be a chapter in the municipal code that sits there as a symbol."

L.A. porn has been both an economic engine and an intractable frustration. State and federal laws require employers to protect workers from potentially infectious bodily fluids, and Cal/OSHA has jurisdiction over workplace hazards—as the county has long argued. The state contends, however, that its resources are tight and employment complaints rarely arise from porn sets, where most performers are hired as independent contractors, not employees.

For years, the industry said it was policing itself through a screening database maintained by a nonprofit industry clinic, but HIV outbreaks in 1998, 2004 and 2009 fueled fears. In 2010, amid complaints and litigation from the AIDS Healthcare Foundation, which backed the current initiative, the county shut down the clinic for operating without a license, heightening awareness but eliminating one of the few checks on the industry.

The county has called for tougher state laws and reported suspected violations to Cal/OSHA. But local health officials have maintained that they have neither the resources nor the jurisdiction to become Los Angeles' porn police.

Though the industry has generated thousands of STD and HIV cases over the years, the porn problem is dwarfed by other at-risk populations. The adult film industry has accounted for fewer than 20 of the more than 20,000 cases of HIV reported since 2004 in the county, for example. HIV afflicts an estimated 30% of the county's black gay men.

"Every resident of the county matters to us," said Perez, "but there are many other groups we also have to serve with scarce resources."

The measure would force the county to create and administer a new permitting and enforcement bureaucracy. DPH could conduct random spot checks and, if necessary, revoke permits. Violators would be fined and/or charged with misdemeanors.

Advocates say the measure would be no less workable than the county's systems for inspecting tattoo shops and food trucks. However, Fielding noted that most porn producers don't tweet their location or hang out a shingle. Moreover, he notes, it is unclear whether industry fees imposed by the initiative would cover its full costs.

"Say you have a permit for 24 hours. Are we going have to have somebody monitoring all that time?" asked Fielding. "Or could it be a [less costly] complaint-driven system?"

AHF President Michael Weinstein countered on Tuesday that "all the health permits the county issues have spot inspections. That's what we're looking for."

Legal questions also abound about the proposed measure's geographic jurisdiction and

constitutionality. Industry lobbyists charge that the measure threatens their free speech. If the law is enacted and found unconstitutional, the county would be legally liable.  But if enforcement fails to meet the standards of the initiative's backers, they, too, could sue.

The Los Angeles City Council is still struggling to enforce a similar, though much narrower ordinance enacted there in January. Support for the county initiative seems to be strong, however: It easily qualified for the ballot, and an AHF spokesman testified that 63% of county registered voters had voiced approval of it in a March poll.

- Share this:

Exhibit C



The Meeting Transcript of
The Los Angeles County
Board of Supervisors

1

2   **SUP. YAROSLAVSKY, CHAIRMAN:** OKAY. SO THEY APPROVED AN

3   ORDINANCE SIX OR SEVEN MONTHS AGO WHICH HAS NOT YET BEEN

4   ENFORCED. HAS ANYBODY BEEN HIRED? ANY INSPECTORS?

5

6   **STEPHEN KAUFMAN:** PART OF THE PROCESS WITH THE CITY RIGHT NOW

7   IS FIGURING OUT EXACTLY WHO'S GOING TO BE DOING THE

8   INSPECTIONS AND THE ENFORCEMENT MECHANISM AND THOSE ARE THE

9   ISSUES THAT MY CLIENT IS CERTAINLY WILLING TO TALK ABOUT AND

10  HELP THE COUNTY GET TO A POINT WHERE WE CAN HAVE A FULL

11  ENFORCEMENT AND IMPLEMENTATION OF BOTH THE CITY MEASURE AND

12  THE COUNTY MEASURE AS THEY WORK HAND IN GLOVE.

13

14  **SUP. YAROSLAVSKY, CHAIRMAN:** OKAY. I APPRECIATE THE COMPLEXITY.

15  AND SEVERAL OF THE PEOPLE WHO SPOKE TO THIS SPOKE ABOUT THE

16  COMPLEXITY OF IT. I SPEAK FOR MYSELF ON THE MOTIVATION BEHIND

17  IT. I DON'T THINK THERE'S ANY DISTANCE BETWEEN PROBABLY ANY OF

18  US BUT CERTAINLY ON MY PART ON THE INTENTION, THE MOTIVE

19  BEHIND THE ORDINANCE. IT'S JUST I'VE ALWAYS BELIEVED WHEN WE

20  PASS A LAW THAT IT OUGHT TO HAVE SOME TEETH TO IT AND OUGHT TO

21  HAVE SOME CREDIBILITY. AND TO PASS AN ORDINANCE THAT IS NOT

22  ENFORCED OR IT'S NOT ENFORCEABLE IS MISLEADING THE PUBLIC, IN

23  A WAY. BUT YOUR CLIENT KNOWS I HAVE AND THE PUBLIC HEALTH

24  DEPARTMENT HAVE BEEN SEARCHING FOR A SILVER BULLET, IF YOU

25  WILL, THAT WOULD CONNECT A REGULATION OR AN ORDINANCE TO AN



```
1    ENFORCEMENT MECHANISM THAT WOULD PRODUCE THE DESIRED RESULT,

2    WHICH IS TO PROTECT THE ACTORS AND ACTRESSES WHO ARE IN THIS

3    INDUSTRY, WHO ARE COMPELLED TO WORK UNDER CONDITIONS THAT PUT

4    THEIR HEALTH AND SAFETY AT RISK, THERE'S NO QUESTION ABOUT

5    THAT. BUT AS WE KNOW, MOST OF THIS INDUSTRY IS UNDERGROUND.

6    NEITHER THE CITY NOR THE COUNTY NOR O.S.H.A. IS GOING TO BE

7    ABLE TO FIND EVERY GARAGE IN THE COUNTY OF LOS ANGELES WHERE

8    THE FILMING TAKES PLACE OR EVERY RENTED HOME IN THE HILLS

9    WHERE FILMING TAKES PLACE. THEY DON'T APPLY FOR PERMITS, SO

10   WE'RE NOT GOING TO KNOW. AND THAT'S BEEN THE FRUSTRATION. AND

11   SO HAVING SAID THAT, SIGNATURES HAVE BEEN GATHERED AND THE

12   COUNTY REGISTRAR CERTIFIED IT AND I DO BELIEVE THAT THE VOTERS

13   HAVE A RIGHT TO VOTE ON THIS IN NOVEMBER AS THE LAW

14   PRESCRIBES, NO QUESTION ABOUT IT. BUT I DO THINK THAT THERE'S

15   GOING TO HAVE TO BE A LOT OF WORK DONE, AND THAT'S ONE OF THE

16   THINGS I WANT TO ASK OUR PUBLIC HEALTH OFFICER, DR. FIELDING.

17   A LOT OF WORK'S GOING TO HAVE TO BE DONE BETWEEN NOW AND THE

18   PASSAGE OF THIS ORDINANCE TO CREATE A PATH FORWARD FOR

19   CREDIBLE ENFORCEMENT OF THE LAW, OTHERWISE THERE'S NOTHING

20   WORSE THAN A LAW THAT IS A MOCKERY FROM THE STARTER'S GATE.

21   AND SO WE NEED TO FIGURE OUT A WAY TO MAKE THIS STICK AND NOT

22   JUST BE A CHAPTER IN THE MUNICIPAL CODE OR IN THE COUNTY CODE

23   THAT SITS THERE AS A SYMBOL BUT NOT AS A RESULT, NOT AS AN

24   IMPROVEMENT OF PUBLIC HEALTH. BUT WE ARE ALL OPEN TO IDEAS ON
```

1   HOW TO DO THAT. AND I'M SURE THAT DR. FIELDING WILL SAY THE

2   SAME THING. THAT'S BEEN THE FRUSTRATION OF THIS. GO AHEAD.

3

4   **STEPHEN KAUFMAN:** AND WE SHARE AND APPRECIATE THE FRUSTRATION.

5   I JUST WANT TO BE CLEAR THAT THERE'S A BIG DIFFERENCE BETWEEN

6   ENFORCEABILITY AND ENFORCEMENT. AND WE BELIEVE THAT THIS LAW

7   THAT'S PROVIDED IN THE INITIATIVE IS FULLY ENFORCEABLE. IT'S

8   JUST AN ISSUE OF COMING UP WITH THE MECHANISM TO DO THAT.

9

10  **SUP. YAROSLAVSKY, CHAIRMAN:** SO LET ME ASK YOU, SINCE WE'RE NOT

11  PAYING YOU BY THE HOUR HERE, WEINSTEIN IS, WE LIKE THAT IDEA,

12  WHAT IS YOUR IDEA OF HOW WE GET THE BIG PRODUCTION COMPANIES,

13  THE HANDFUL OF THEM THAT THERE ARE, WE KNOW HOW TO DEAL WITH

14  THAT. HOW DO YOU PROPOSE THAT THE COUNTY HEALTH DEPARTMENT,

15  THE PUBLIC HEALTH DEPARTMENT DEAL WITH THE SOLE PRACTITIONERS,

16  THE UNDERGROUND INDUSTRY, THE PEOPLE WHO SHOOT ON AN AD HOC

17  BASIS, DON'T COME TO THE COUNTY OR THE CITY FOR FILM PERMITS,

18  PROBABLY ARE VIOLATING EVERY RULE IN THE BOOK. HOW DO WE FIND

19  THEM?

20

21  **STEPHEN KAUFMAN:** WELL, AS MR. WEINSTEIN SAID, WE CAN'T LET THE

22  PERFECT BECOME THE ENEMY OF THE GOOD. THAT'S GOING TO I THINK

23  CONTINUE TO PERSIST AS A PROBLEM. BUT I THINK THE PERMIT

24  APPLICATION PROCESS HAS TO BE IMPROVED. THERE HAS TO BE A

25  BETTER WAY OF I THINK, A, IDENTIFYING PRODUCERS OF THESE FILMS

Exhibit D



**The Meeting Transcript of The Los Angeles County Board of Supervisors**

1    **SUP. YAROSLAVSKY, CHAIRMAN:** OKAY. THANK YOU. YES, MS. MOLINA?

2

3    **SUP. MOLINA:** I'D LIKE YOU TO MAKE IT ABUNDANTLY CLEAR. IS THIS

4    A WORKPLACE ISSUE?

5

6    **STEPHEN KAUFMAN:** IT IS A WORKPLACE ISSUE.

7

8    **SUP. MOLINA:** CAN YOU TELL ME WHERE LOCAL JURISDICTIONS HAVE

9    TAKEN OVER WORKPLACE RESPONSIBILITIES THAT BELONG TO CAL/OSHA?

10

11   **STEPHEN KAUFMAN:** THE CAL/OSHA PROVISIONS RELATING TO THIS

12   OVERLAP THE COUNTY'S.

13

14   **SUP. MOLINA:** I ASKED A DIFFERENT QUESTION. SO WHY DON'T YOU

15   ANSWER MY QUESTION?

16

17   **STEPHEN KAUFMAN:** COULD YOU REPEAT YOUR QUESTION?

18

19   **SUP. MOLINA:** OKAY. WHAT OTHER MUNICIPALITY HAS TAKEN ON

20   RESPONSIBILITY FOR WORKPLACE ISSUES THAT EXCLUDE CAL/OSHA FROM

21   THEIR RESPONSIBILITY?

22

23   **STEPHEN KAUFMAN:** I WOULDN'T SAY THAT THIS EXCLUDES CAL/OSHA

24   FROM ITS RESPONSIBILITY SO I'M NOT SURE WITH THE PREMISE OF

25   YOUR QUESTION.



**The Meeting Transcript of**
**The Los Angeles County Board of Supervisors**

1

2   **SUP. MOLINA:** I WANT TO UNDERSTAND. WHO HAS THE RESPONSIBILITY

3   FOR THE WORKPLACE ISSUES IN ONE OF THESE SETS?

4

5   **STEPHEN KAUFMAN:** IN THE WHAT OF THESE SETS? I'M SORRY.

6

7   **SUP. MOLINA:** AGAIN. WHAT ARE THEY? PORNO SETS? WHAT ARE ARE

8   THEY? THEY'RE WORK PLACES WHERE PEOPLE WORK. AND THEY COME

9   THERE. WHO IS RESPONSIBLE FOR THE WORKPLACE ISSUES?

10

11  **STEPHEN KAUFMAN:** I THINK THERE ARE MULTIPLE PEOPLE WHO ARE

12  RESPONSIBLE FOR THE WORKPLACE ISSUES. CAL/OSHA, WITH RESPECT

13  TO THE STATE STANDARDS THAT HAVE BEEN ADOPTED AND CONTINUE TO

14  BE MODIFIED TO ADDRESS WORKPLACE ISSUES IN THE ADULT FILM

15  INDUSTRY. I THINK THE CITY OF LOS ANGELES HAS NOW ADOPTED AN

16  ORDINANCE AS WE'VE DISCUSSED BEFORE.

17

18  **SUP. MOLINA:** THEY'VE ADOPTED A WORKPLACE ORDINANCE?

19

20  **STEPHEN KAUFMAN:** THEY'VE ADOPTED AN ORDINANCE THAT WILL APPLY

21  TO PERFORMERS IN THE ADULT FILM INDUSTRY WITH RESPECT TO THESE

22  ISSUES.

23

24  **SUP. MOLINA:** IS THAT A WORK PLACE ISSUE, THOUGH?

25



1   **STEPHEN KAUFMAN:** I THINK THIS IS A DEFINITIONAL QUESTION THAT

2   YOU'RE ASKING, AND I'M NOT SURE WHAT DIRECTION YOU'RE TRYING

3   TO GO WITH THIS.

4

5   **SUP. MOLINA:** YOU'RE A PROPONENT OF IT.

6

7   **STEPHEN KAUFMAN:** MY CLIENT IS A PROPONENT OF IT.

8

9   **SUP. MOLINA:** THAT'S RIGHT. YOU ARE REPRESENTING A PROPONENT.

10

11  **STEPHEN KAUFMAN:** CORRECT.

12

13  **SUP. MOLINA:** I AM ASKING FOR CLARIFICATION. AND SO I'M TRYING

14  TO UNDERSTAND THE JURISDICTIONAL RESPONSIBILITIES THAT GO WITH

15  IT. IT IS A WORKPLACE ISSUE, AND SO I'M TRYING TO UNDERSTAND

16  CLEARLY WHAT DOES THE CITY-- WHAT KIND OF JURISDICTION DOES

17  THE CITY HAVE OVER THAT WORKPLACE?

18

19  **STEPHEN KAUFMAN:** THE CITY HAS JURISDICTION OVER ITS PERMITTING

20  PROCESS THAT ALLOWS PEOPLE TO FILM IN THE WORKPLACE. SO THE

21  CITY MEASURE THAT WAS PASSED ADDRESSES THE ISSUANCE OF THE

22  FILM PERMIT AND THE ABILITY OF SOMEONE TO OPERATE UNDER THAT

23  PERMIT.

24



1   **SUP. MOLINA:** UNDER THIS PROPOSAL, HOW WOULD THE CITY HAVE ANY

2   RESPONSIBILITY TO THE WORKPLACE?

3

4   **STEPHEN KAUFMAN:** UNDER THIS PROPOSAL, IT IS A COUNTY ISSUE,

5   NOT A CITY ISSUE.

6

7   **SUP. MOLINA:** THAT'S CORRECT.

8

9   **STEPHAN KAUFMAN:** THERE IS AN OVERLAPPING JURISDICTION. THOSE

10  CITIES THAT ADOPT MEASURES LIKE THE CITY OF LOS ANGELES WILL

11  HAVE PERMITTING REQUIREMENTS, OR REQUIREMENTS ASSOCIATED WITH

12  THE ISSUANCE OF A FILM PERMIT IN THEIR CITY. THE COUNTY

13  MEASURE, WHICH OVERLAPS THE CITY MEASURE IN THE CITY OF LOS

14  ANGELES OR ANY OTHER CITY THAT MAY ADOPT A PERMIT, THE COUNTY

15  ORDINANCE IS A PUBLIC HEALTH PERMIT THAT IS REQUIRED TO BE

16  ABLE TO CONDUCT THESE ACTIVITIES IN THE COUNTY. THEY'RE TWO

17  DIFFERENT COMPONENTS.

18

19  **SUP. MOLINA:** I UNDERSTAND. SO UNDER THE CITY'S RESPONSIBILITY

20  THAT IS ISSUING THESE PERMITS, WILL THEY ASSUME ALL LIABILITY

21  THAT IS ASSOCIATED WITH THE WORKPLACE ISSUES?

22

23  **STEPHEN KAUFMAN:** I DON'T EXPECT THAT THEY WOULD.

24

1    **SUP. MOLINA:** SO WHY WOULD THE COUNTY, WHY WOULD OUR

2    MUNICIPALITY TAKE ON RESPONSIBILITY FOR WORKPLACE ISSUES THAT

3    ARE NOT PRESENTLY OUR RESPONSIBILITY?

4

5    **STEPHEN KAUFMAN:** BECAUSE THE COUNTY DEPARTMENT OF PUBLIC

6    HEALTH IS SUPPOSED TO OVERSEE AND WORK ON THE PREVENTION OF

7    THE SPREAD OF THESE INFECTIOUS DISEASES THROUGHOUT THE COUNTY.

8    AND BY IMPLEMENTING THIS ORDINANCE ON A COUNTY-WIDE BASIS, IT

9    WILL BE FULFILLING ITS DUTIES AND RESPONSIBILITIES THROUGH ITS

10   DEPARTMENT OF PUBLIC HEALTH.

11

12   **SUP. MOLINA:** AND I UNDERSTAND THOSE DUTIES. AND WE HAVE THOSE

13   DUTIES IN ALL AREAS. FOR EXAMPLE, OUR RESTAURANTS WHERE

14   THERE'S PUBLIC CONSUMPTION, WHERE THERE'S RESPONSIBILITIES

15   THAT WE HAVE TO MAINTAIN. RIGHT NOW, WE DON'T GOVERN SAFE SEX

16   IN THE BEDROOM UNDER OUR PUBLIC HEALTH RESPONSIBILITY. AND YET

17   IF YOU LOOK AT MANY OF THE ISSUES AS TO HOW AIDS IS SPREAD, IT

18   IS BECAUSE OF UNSAFE SEX IN THE BEDROOM. AND PUBLIC HEALTH HAS

19   A RESPONSIBILITY AND A DUTY. AND WE TAKE THOSE

20   RESPONSIBILITIES VERY SERIOUSLY. WE'RE INVOLVED IN A LOT OF

21   PREVENTION ISSUES. WE DO A LOT OF WORK IN THAT AREA. BUT WE

22   ARE NOT IN THE BEDROOM DURING THAT TIME. AND SO CONSEQUENTLY,

23   WHILE WE MAKE EVERY EFFORT ON BEHALF OF THE PUBLIC TO PROMOTE

24   SAFE SEX, WE ARE NOT INVOLVED IN THOSE ISSUES. SO I'M TRYING

25   TO UNDERSTAND WHY WE WOULD, AS A COUNTY, TAKE ON THE HUGE

**The Meeting Transcript of**
**The Los Angeles County Board of Supervisors**

1  RESPONSIBILITY OF WORKPLACE ISSUES, WHICH CAN BE RELATED TO

2  ALL KINDS OF ISSUES. YOU COULD HAVE A PERFORMER WHO MIGHT HAVE

3  SOME KIND OF S.T.D. OF SOME TYPE AND THEN SUE US AS A

4  RESPONSIBILITY. UNDER THIS PROVISION, THE COUNTY WOULD NOT BE

5  FREE OF THOSE LAWSUITS; IS THAT CORRECT?

6

7  **STEPHEN KAUFMAN:** I DON'T KNOW THAT. I THINK, YOU KNOW, IN THIS

8  ISSUE, AS OPPOSED TO THE PRIVACY OF THE HOME, WE'RE TALKING

9  ABOUT A COMMERCIAL ENTERPRISE THAT'S TAKING PLACE IN THE

10  COUNTY. AND I THINK THE COUNTY HAS EVERY INTEREST IN MAKING

11  SURE THAT IF THERE IS A COMMERCIAL ENTERPRISE BEING ENGAGED IN

12  WITHIN THE COUNTY THAT IT UNDERTAKE TO SEE THAT THOSE WHO ARE

13  BEING PAID TO ENHANCE THAT COMMERCIAL ENTERPRISE ARE PROTECTED

14  AND TO PREVENT WHATEVER RESULTS FROM THAT COMMERCIAL

15  ENTERPRISE TO SPREAD TO OTHERS IN THE COUNTY. AND AS FAR AS --

16

17  **SUP. MOLINA:** WELL, I UNDERSTAND THAT. AND WE'RE ALL IN FAVOR

18  OF SAFE SEX. WE'RE ALL IN FAVOR OF PORNO STARS USING

19  CONDOMINIUMS -- CONDOS -- CONDOMS. I'M GOING TO GET THIS RIGHT

20  YET. BUT THE ISSUE IS: IS THE ISSUE OF LIABILITY FOR THE

21  COUNTY AND ALL OF THE MONEY THAT THE RESIDENTS OF L.A. COUNTY

22  WILL HAVE TO PAY. RIGHT NOW, OUR LIABILITY, I MEAN WHAT WAS

23  THE COST LITIGATION MANAGER'S LAST REPORT, MR. KRATTLI, OF HOW

24  MUCH OUR RESPONSIBILITY WAS IN L.A. COUNTY THAT WE PAID OUT

25  LAST YEAR ALONE?